**Monserrate SANTIAGO, Appellant,**

v.

**Jesse BROWN, Secretary of Veterans Affairs, Appellee.**

**No. 91–1036.**

United States Court of Veterans Appeals.

July 20, 1993.

Monserrate Santiago, pro se.

James A. Endicott, Jr., Gen. Counsel, David T. Landers, Acting Asst. Gen. Counsel, Thomas A. McLaughlin, Deputy Asst. Gen. Counsel, and Edward V. Cassidy, Jr., were on the pleadings, for appellee.

Before KRAMER, HOLDAWAY and IVERS, Judges.

IVERS, Judge:

Appellant, Monserrate Santiago, the mother and custodian of the veteran, Myrna A. Hamlin, appeals on behalf of her daughter from a May 22, 1991, Board of Veterans' Appeals (BVA or Board) decision which denied the veteran's claim for *direct* service connection for Graves' disease (service connection for the disorder had been granted in 1988 on a presumptive basis) and for an earlier effective date for the service-connected disorder. The Court has jurisdiction of the case under 38 U.S.C.A. § 7252(a) (West 1991). The Court holds that the Board appears to have based its conclusion that direct service connection is not warranted in this case upon its own unsubstantiated medical opinion, thereby contravening this Court's holding in *Colvin v. Derwinski*, 1 Vet.App. 171, 175 (1991).

Accordingly, we vacate the decision of the BVA and remand the case for readjudication consistent with this opinion.

## I. FACTS

The veteran served on active duty with the United States Army from January 1981 to December 1986. R. at 1. Various medical problems are noted in her service medical records (SMRs), including pain in knees (R. at 12–14, 16), eye problems (R. at 17–19, 24–25, 32–33, 40, 68), lumps in her neck (R. at 27, 29), blood in her urine (R. at 29), rashes on her face and neck (R. at 42–43, 57–59), neck pain and swelling (R. at 47, 57–59), stomach pains and nausea (R. at 47), and progressive weakness and shortness of breath on exertion (R. at 37–39).

On May 9, 1986, the veteran reported to a camp clinic in Korea, complaining of "dizziness, stomach pains, excessive spitting, [and] tongue cramps...." R. at 47. Later that day, she returned for treatment, complaining of increased pain in her jaws, difficulty with speech, and loss of control over her tongue and sputum. R. at 48. In July 1986, the veteran reported pain in her left side and blood in her urine. R. at 53. On September 3, 1986, she was seen again for stomach pain and "a lot of spit." R. at 55. On September 7, 1986, complaining of bilateral jaw pain, excess salivation, and feeling as though she could not control her tongue, she was examined in the dental clinic, but no evidence of dental disease was found. R. at 56. Again on September 8, 1986, she reported to the clinic for weakness, excessive salivation, and a neck rash. R. at 57–58. She was evacuated to a military hospital in San Francisco where doctors initially thought that she might have systemic lupus erythematosus (SLE). R. at 58–62. SLE is

> a systemic disease of unknown cause and unpredictable course that is characterized esp[ecially] by fever, skin rash, and arthritis, often by acute hemolytic anemia, by small hemorrhages in the skin and mucous membranes, by inflammation of the pericardium, and in serious cases by involvement of the kidneys and central nervous system.

Webster's Medical Desk Dictionary at 700 (1986) [hereinafter Webster's].

In October 1986, while doctors continued to observe her to determine whether it was SLE from which she suffered, a doctor noted that the veteran was three months pregnant. R. at 66. In December 1986, the veteran accepted a discharge because of her pregnancy. R. at 73–75. Her discharge examination report reveals that at the time of discharge doctors still had not ruled out SLE as the cause of her medical problems. *Id.* In October 1987, the veteran applied for compensation or pension from the Veterans' Administration (now Department of Veterans Affairs) (VA). R. at 103–05. In January 1988, the veteran was admitted to a VA hospital where she was diagnosed with Graves' disease. R. at 106. Graves' disease, also called hyperthyroidism, exophthalmic goiter, and toxic goiter, is described as "excessive functional activity of the thyroid gland ..., the resulting condition marked esp[ecially] by increased metabolic rate, enlargement of the thyroid gland, rapid heart rate, and high blood pressure." Webster's at 274, 315. Moreover,

> in Graves' disease[,] certain characteristic ocular abnormalities may be observed.... With the exception of the ophthalmic findings, ... [other] signs and symptoms of Graves' disease ... include elevated basal metabolic rate, increased sweating, muscle wasting and weakness, tremor, increased bowel activity, increased appetite, rapid and irregular heart action, weight loss, and apprehensiveness.

Cecil-Loeb Textbook of Medicine 1372 (11th ed. 1963). A doctor at the VA hospital noted that some of the symptoms of hyperthyroidism that the veteran reported experiencing since 1986 were "heat intolerance, [increased] appetite, easy weight loss, increased sweating, tachycardia, nightmares, palpitations, [and] anxiety." R. at 106. In August 1988, after undergoing VA psychiatric examinations, the veteran was judged by VA psychiatrists to be incompetent for the purposes of handling funds. R. at 121–24.

On November 18, 1988, a VA regional office (RO) rating board granted the veteran service connection for Graves' disease and organic mental disorder (organic affective syndrome associated to toxic goiter) and evaluated her as 100% disabled effective from January 8, 1988, the date of admission to the VA hospital where she was diagnosed with Graves' disease. R. at 125–26. The rating board decided that, "[a]lthough there is a difference of two weeks following presumptive period in which veteran developed Graves' disease (toxic goiter), sound medical principles demonstrate that the initial symptoms may have developed much earlier than ... [January 1, 1988,] or within the presumptive period following discharge from service." R. at 126. Also on November 18, 1988, the RO rating board proposed a change in competency status for the veteran based on the psychiatric evaluations but final action was deferred on this issue for compliance with the requirements of VA Adjudication Manual, M–21, Chapter 14.37, Due Process in Incompetency Determinations. R. at 128–29. In a letter dated December 16, 1988, the veteran informed the VA that she had no objections to a decision changing her competency status to incompetent and requested that her mother, Mrs. Monserrate Santiago, be named her fiduciary. R. at 130. On February 10, 1989, the rating board rendered a final determination that the veteran was incompetent for VA purposes as of that date. R. at 131–32.

On May 8, 1989, the veteran submitted a Notice of Disagreement (NOD) with the RO rating board's decision to grant service connection for Graves' disease as of January 8, 1988. R. at 133. The veteran stated that the effective date should have been December 25, 1986, the day after her discharge from service. *Id.* In addition, the veteran felt that the RO rating board did not need to rely on the statutory presumptive period in order to grant the veteran's claim for service connection for Graves' disease, but rather, should have granted the veteran *direct* service connection. *Id.* The veteran felt that her SMRs reflected that she experienced the symptoms of Graves' disease in service and that there-

fore the disease was incurred in service rather than in the one-year period following discharge. *Id.*

On November 15, 1989, a hearing was held at the RO, during which the veteran testified that she received treatment in the emergency room of a VA hospital for Graves' disease in November 1987. R. at 164. Based on this testimony, the hearing officer ordered a search for those hospital records and, after receiving them, changed the effective date of service connection for Graves' disease to November 3, 1987. R. at 165–80. In her appeal to the BVA, the veteran claimed entitlement to direct service connection and an earlier effective date. *Monserrate Santiago in the Case of Myrna M. Hamlin,* BVA 91–30443, at 2 (May 22, 1991) [hereinafter *Santiago*].

In denying the veteran's claim for direct service connection based upon her SMRs, the BVA noted,

> [C]ommon symptoms of Graves' disease include nervousness, increased sweating, hypersensitivity to heat, palpitation, weight loss, tachycardia, dysphasia, weakness, increased appetite, and eye complaints. WILLIAMS, TEXTBOOK OF ENDOCRINOLOGY, Seventh Edition, 1985, pages 754–755 [parentheses omitted]. . . .
>
> . . . .
>
> In the opinion of the Board, symptomatology establishing the onset of Graves' disease was not demonstrated during military service. The Board is cognizant of the fact that *certain of the veteran's complaints during military service parallel symptoms of Graves' disease,* most notably her complaints of progressive weakness and shortness of breath on exercise, as well as eye complaints at various times. *However, these complaints are much more easily explainable,* even with the benefit of hindsight, *as being due to causes other than Graves' disease.* Signs and symptoms in a number of nonthyroid disorders may simulate certain aspects of thyrotoxic syndrome. HARRISON'S PRINCIPLES OF INTERNAL MEDICINE, [p]age 1744, McGraw–Hill Book Company, 1987 [underscoring omitted]. *The eye complaints are traceable to astigmatism and myopia; the complaints of tiredness and shortness of breath following exercise are not uncommon among military personnel.* The Board has also compared the sporadic, rather vague complaints voiced by the veteran at various times during her active military service to the very specific complaints which she voiced in January 1988 during her VA hospitalization. Those complaints, which were characteristic of Graves' disease, included heat intolerance, increased appetite, easy weight loss, increased sweating, tachycardia, nightmares, palpitations, and anxiety. Virtually all these complaints were not present during military service. The Board believes that symptomatology of Graves' disease did not occur during military service. Accordingly, . . . the veteran was properly granted service connection for Graves' disease on a presumptive basis.

*Santiago,* BVA 91–30443, at 4–6 (emphasis added). With regard to the claim for an effective date earlier than November 3, 1987, the Board stated,

> In our opinion, the facts clearly demonstrate that the first date on which Graves' disease was identified was November 3, 1987. On that date, an enlarged thyroid was identified by a VA physician. We can identify no earlier date when symptoms referable to Graves' disease were identified. . . . November 3, 1987 was the date upon which entitlement arose and therefore was the appropriate effective date for service connection for Graves' disease.

*Id.,* BVA 91–30443, at 6. The veteran perfected a timely appeal of the BVA decision to this Court.

## II. ANALYSIS

■ Service connection for Graves' disease may be granted "directly," i.e., under the basic entitlement provisions of the law which allow compensation to be paid "[f]or disability resulting from . . . disease contracted in line of duty, in the active military, naval, or air service. . . ." 38 U.S.C.A. § 1131 (West 1991); *see also* 38

U.S.C.A. § 1110 (West 1991). However, the law "presumes" for the purposes of service connection that some chronic diseases that manifest themselves to a certain extent within one year after discharge had their onset in service:

> (a) For the purposes of [entitlement to compensation], ... in the case of any veteran who served for ninety days or more ...

> (1) a chronic disease becoming manifest to a degree of 10 percent or more within one year from the date of separation from such service ...

> ....

> shall be considered to have been incurred in or aggravated by such service, notwithstanding there is no evidence of such disease during the period of service.

38 U.S.C.A. § 1112(a)(1) (West 1991); *see also* 38 U.S.C.A. § 1137 (West 1991). Because Graves' disease is an "endocrinopathy," or "a disease marked by dysfunction of an endocrine gland" (WEBSTER'S at 210), it is considered a "chronic disease" under the law (38 U.S.C.A. § 1101(3) (West 1991)), and therefore service connection may be granted on a "presumptive" basis to a veteran who suffers from it.

Although appellant and the BVA discuss this case in terms of two issues—(1) direct service connection as opposed to service connection based upon the statutory presumptive period and (2) an earlier effective date for service connection—both of these matters involve the same general question posed by this case, i.e., a question about the timing of the onset of appellant's service-connected disease. More specifically, the issue presented in this case is whether the Board's opinion that the onset of Graves' disease did not begin any earlier than November 3, 1987, is an unsubstantiated *medical* determination, which this Court has held the Board is unauthorized to render (*Colvin*, 1 Vet.App. at 175), or whether it is a *legal* determination, i.e., a finding of fact which the Board, as fact finder, has derived from a review of medical evidence which is sufficiently conclusive as to the underlying medical issues to enable the Board to render the legal determination.

The Board, citing a medical treatise, listed common symptoms of Graves' disease and then acknowledged that "certain of the veteran's complaints during military service *parallel symptoms* of Graves' disease." *Santiago*, BVA 91–30443, at 5 (emphasis added). The Board then cited another medical treatise to support the general proposition that "[s]igns and symptoms in a number of nonthyroid disorders may simulate certain aspects of thyrotoxic syndrome." *Id.* The question then moved from the general to the specific: whether the parallel symptoms that the veteran exhibited during service were attributable, in this particular case, to Graves' disease or to other nonthyroid disorders. The BVA concluded that in the veteran's case, the parallel symptoms were *"easily explainable ... as being due to causes other than Graves' disease,"* namely, to astigmatism and myopia for the eye complaints, and to the rigors of military life for the complaints of progressive weakness and shortness of breath upon exertion. *Id.* (emphasis added). The Board cited no medical evidence to support this specific conclusion about the causes of the veteran's symptoms. However, because the veteran was diagnosed with compound myopic astigmatism in service (R. at 25), the Board apparently was relying on the veteran's SMRs to substantiate its conclusion as to the eye problems.

■ A determination about when a disorder was incurred is a finding of fact subject to the "clearly erroneous" standard of review; the Court may not reject the BVA's conclusion if it is supported by a plausible basis in the record. *Sanders v. Derwinski*, 1 Vet.App. 88, 90 (1990); *Lovelace v. Derwinski*, 1 Vet.App. 73, 74 (1990); *Gilbert v. Derwinski*, 1 Vet.App. 49, 53 (1990). A veteran's SMRs may constitute, in some cases, sufficient medical evidence to demonstrate that symptoms exhibited in service, which are typical of both a condition for which a veteran is entitled to service connection and one for which the veteran is not so entitled, were caused by the

latter. In such cases, the SMRs alone may constitute sufficient medical evidence upon which the Board may base a legal determination about the onset of a disorder. However, in this case, the Court holds that the veteran's SMRs do not provide a plausible basis for the conclusion reached by the Board that the veteran's symptoms were "easily explainable ... as being due to causes other than Graves' disease." *Santiago,* BVA 91–30443, at 5.

■ In this regard, the Court notes that, although a treatise may not properly form the sole basis for a decision of the Board, the BVA should use treatises to clarify the clinical evidence in the record and to assist the veteran and this Court in understanding clinical terminology and in interpreting medical evidence in the record. In this case, for example, the Board might have used medical treatises to help explain how the clinical evidence in the record supports the Board's specific conclusion that the veteran's symptoms were more readily attributed to other disorders than to Graves' disease.

In addition, the Court recently has held that

> before the BVA relies, in rendering a decision on a claim, on any evidence developed or obtained by it subsequent to the issuance of the most recent [Statement of the Case or Supplemental Statement of the Case] with respect to such claim, the BVA must provide a claimant with reasonable notice of such evidence and of the reliance proposed to be placed on it, and a reasonable opportunity for the claimant to respond to it. If, in the course of developing or obtaining or attempting to so develop or obtain such evidence, the BVA becomes aware of any evidence favorable to the claimant, it shall provide the claimant with reasonable notice of and a reasonable opportunity to respond to the favorable evidence, and shall in its decision provide reasons or bases for its findings with respect to that evidence.

*Thurber v. Brown,* 5 Vet.App. 119, 126 (1993); *Colvin v. Derwinski,* 4 Vet.App. 132 (per curiam order instructing Secretary that copies of all medical treatises cited by the Board in the May 31, 1991, BVA decision will be made part of the record on appeal). Because in this case appellant was not afforded an opportunity to respond to the medical treatises that the Board cited in its decision, remand is required.

■ Therefore, for the reasons noted above, the Court vacates the decision of the Board and remands the case for readjudication consistent with this opinion. Upon remand, the Board should provide reasons or bases for its findings and conclusions in accordance with 38 U.S.C.A. § 7104(d)(1) (West 1991) and with this Court's holding in *Gilbert,* 1 Vet.App. at 56. With regard to reasons or bases, the Court notes that in her NOD the veteran argued that the effective date for service connection for her disease should have been December 25, 1986, the day after her discharge. Because under certain conditions there is a basis for such a date in the statute and regulations governing effective dates, the Board should provide reasons or bases for its assignment of an effective date for the veteran's service-connected disease so that appellant may understand the Board's decision on that matter and how it relates to whatever decision the Board renders on the issue of direct, as opposed to presumptive, service connection. *See* 38 U.S.C.A. § 5110(b)(1) (West 1991) ("The effective date of an award of disability compensation to a veteran shall be the day following the date of the veteran's discharge or release if application therefor is received within one year from such date of discharge or release."); 38 C.F.R. § 3.400(b)(2)(i) and (ii) (1992) (distinguishing between effective dates for direct service connection and presumptive service connection).

## III. CONCLUSION

For the reasons stated above, the May 22, 1991, decision of the BVA is VACATED and the case REMANDED for readjudication consistent with this opinion.